Good afternoon. May it please the Court, I'm Michelle Frahn from Keesey, Young & Logan, and I'm here on behalf of Prudential Equity Group, and we thank you for your time and consideration in helping us resolve these matters. It is our position that Judge Wilson reviewed all of this documentation, unlike Mr. Citrick when he made his investment. And in reviewing that documentation, Judge Wilson properly affirmed that there were no material misrepresentations made to the investors in this CBO2 product. Let me direct you to one issue that is bothering me, and that is the question of whether it was appropriate in summary judgment to hold that Mr. Rosen was not Mr. Citrick's lawyer and therefore could not be an agent for purposes of reviewing a reliance. Judge Wilson did conclude that Mr. Rosen may not have been acting as his attorney. I believe that we come to the same conclusion that this case can be disposed of on a motion to dismiss and or summary judgment based upon Mr. Rosen acting as his attorney or not acting as his attorney. And in addressing that issue in particular, it goes to the issue of reliance that is necessary for the causes of action that Mr. Citrick has alleged. And if we take, for example, Mr. Rosen acting as Mr. Citrick's agent, Mr. Citrick has not provided the court with any case law that supports the position that Prudential Equity Group can be held liable for whatever Mr. Rosen did for Mr. Citrick. The cases that were presented by Mr. Citrick are instances where an agent is disclosed to, in this instance, Prudential Equity Group, and in the instance where the principal, Prudential, would have known that Mr. Rosen was acting as an agent. In this case, we did not know that, and it was never disclosed to us. Or that Prudential acted in a manner wherein Prudential disseminated information to Mr. Rosen with the expectation that Mr. Rosen would have provided it to Mr. Citrick. Those are the cases that were suggested to provide Mr. Citrick with the shield. Essentially, your position is he can't have a self-designated agent that the defendant doesn't know about. Precisely. I would also submit that Mr. Rosen's reliance on the offering memoranda and private placement, as it is suggested in the documents, was not reasonable under any circumstances. And so, as a matter of law, the court could conclude that Mr. Citrick does not have reasonable reliance or justifiable reliance on what Mr. Rosen said. The question really is that an investor, in order to claim reliance, has to read the documents himself, even if he's for some reason disabled, like he can't speak English or he's elderly or whatever, rather than designating someone else, some reasonable person to do that for him. In the instance that he does designate someone else, and there are cases, especially in connection with translation issues, that he has to rely on his agent. Right. And therefore, if the agent does, as Mr. Rosen did and said, there's a boilerplate not to worry, and there's a problem, then it's the agent's responsibility. Prudential did not prepare a 200-page offering memoranda for Mr. Rosen to tell Mr. Citrick, don't worry about it, it's mere boilerplate. Prudential prepared 200 pages of documents that are riddled with disclosures and disclaimers about this particular investment. But that's a different issue. That gets to the merits of the materiality. Let's suppose that there was material. You have to assume for purposes of this question, this issue, that there was a material, let's say, affirmative misstatement or misrepresentation in the documents, and that Mr. Rosen, in fact, relied on those in that statement in telling whatever he said to Mr. Citrick, both of which are counterfactual. I understand that. But still, your theory has to be that even if that were the case, your client could not be liable. Correct. Correct. First, we cannot be liable because what Mr. Citrick is suggesting that we put into our disclosure documents are forecasts, mere forecasts of what could happen. If this happens, then that might happen. And the case law is very straightforward on those issues, the convergent technologies, the in-ray verifone, as well as the stack electronics Ninth Circuit that instructs us that forecasts cannot possibly be actionable. And that's exactly what they're requesting us to do, is to say, well, maybe if this happens or if the market goes down this amount, then that's going to happen. Brokerage firms, private placement agents don't put those things in there for two reasons. One, it's impossible to decide what scenarios could possibly occur with this portfolio. And second, it might give reassurances to investors that aren't possible. For example, if we say that history is going to repeat itself, as he suggests are in these documents, we may be telling them that the default rate for the next five years is going to be zero, and therefore you're going to make 11% or 19%. That would be equally as difficult for an investor to be able to rely upon as what they're suggesting that we say that the market's going to go down. The investors in these investments are held to know that the markets go up and the markets go down in either way will affect their investments. One other issue that's been troubling me is with regard to this presentation document that the judge district court found was not a relevant document. That's the one document he did read. Would your position be the same if there were affirmative misstatements in that document? And also, there's also the fact that there's some mismatch between the two offerings. But let's say the offerings were more matched than they are now, but it still said this is not an offering and so on. Are you just saying that that kind of a document simply cannot be relied upon? Well, under the circumstances that Mr. Citrick presents, absolutely. I say that you cannot rely on this presentation. The presentation, if we're going to look at what Mr. Citrick is saying should have been in this document, then we are protected by this document, by the Bespeaks Caution Doctrine, which we discuss in our papers and we appreciate does not directly apply to the actual offering documents, the offering memoranda, and the private placement memoranda. However, case law supports our position that if we do make forecasts, if we do give past historical data, that if we warn the investor that these are past historical representations or that they are in any way giving a suggestion of what may occur in this investment, if we give them cautionary language, the Bespeaks Cautionary Information. I'm asking whether it's your position or what you're understanding is a district court's position, that this presentation document, because on its face it's not an offering document, and even if it had an affirmative misstatement, not a projection, but just an affirmative misstatement, about, for example, how the two classes of securities listed there related to each other in some way that was detrimental to the potential buyers of the second group. Is your position that it simply cannot be the basis for reliance in a fraud case of this kind? Yes, it is. Why isn't that a recipe for fraud? This document represents a suggestion of an investment that's going to be structured. This document, in terms of its timing, But it's certainly meant to entice people into interest in the purchase. It certainly is. But it cannot possibly be relied upon as the offering memoranda and the private placement memoranda must be relied upon because it's not describing, as counsel suggested, this is not describing the final CBO2 investment that was put together and provided to Mr. Citrick in September of 1999. It's a working document in June and July of 1999 that FMA was utilizing in order to determine whether or not there was sufficient investment interest in a product like this. Is there any law under the relative California statutes about something like this? With respect to a presentation? The information with respect to presentations, you know, I don't have anything handy. But what I would suggest is that it's very similar to the case law that discusses sales promotional materials. The Brown v. E.F. Hutton case where they talked about a presentation made by the investment advisor. In every one of those types of cases, in the cases where they say that there's an oral representation, would be similar to this presentation in that in all of the lines of cases of oral representations, the courts tell the reasonable investors that they must look at the final offering documents. The Brown v. E.F. Hutton case, the Kennedy v. Joseph Thal, and the 101 cases are very similar. It falls into the category of the Marlowe v. Gold case that the judge cited to in his opinion in that when you have a reasonable investor, and in this instance, our reasonable investor is an accredited investor who has made a representation to us, that he is knowledgeable in this type of an investment, he has done it before, and indeed is willing to accept the risks in all of those circumstances. What case says that when we look at the reasonable investor, it's the reasonable investor in this particular circumstance as opposed to just some general reasonable investor? That's very interesting because I was not able to find a case that talked about a reasonable investor in terms of a 501 offering. However, when we look at the different cases that talk about reasonable investors, many of them give the Brown v. E.F. Hutton case as a perfect example as well as the Faulkner v. Beer case. They discuss the investor as, in some instances, unsophisticated investors. The Faulkner case, although it was reversed and remanded for different reasons, talks about the investors being unsophisticated, and despite that fact, they are held to be reading the final perspectives. And so if a court can conclude as a matter of law that investors in the open marketplace, and in this instance it was supposed to be in the Brown v. E.F. Hutton case, a limited partnership that was supposed to give them income and safety and security, the court found that they were unsophisticated investors yet required and held to read the prospectus, then one can conclude that if anyone is going to purchase CBO 2, they must be an accredited investor. Then what we are dealing with here today is a pool of accredited investors because an unsophisticated investor, such as in the Brown case, would not be allowed to buy CBO 2. And for that reason, I think as a matter of law, it is fair to say that these investors, because they had to comply with 501, must be accredited investors. On that basis, these accredited investors who make the affirmative representation to Prudential that they know and understand the risks are held to a standard of appreciating the risks that Prudential has put in the offering documents. And they are numerous. As Judge Wilson points out in his order, and as we put in all of our documentation, the offering memoranda and the private placement memoranda are littered with the disclosures that are specific to this investment. Mr. Crum suggests the boilerplate. Could you explain precisely how the Class E tranche or group of security holders lost all of their investment? In other words, how did it come about that their – it seems to me that if there are – we have collateral for the notes. And in order for there to be default on their notes, they somehow have to be called in. And then it has to be attributed to this class. But the other classes still had some equity left? It's just not explained in a way that I understand. It may have been that some of the other classes would have had equity left. But the entire pool of bonds that were put into the investment in the beginning, in September of 1999, the structure of the portfolio, which, by the way, was done by FMA, not done by Prudential, they choose bonds. They choose high-yield debt securities in the hopes that they are going to be able to provide the investors with a tremendous rate of return, and that the A tranche is going to be able to be paid their interest and their principal. The manager of that pool, FMA, leverages that pool of bonds in hopes to increase the rate of return on the portfolios. However, because of the marketplace in 2000, in 2001 and 2002, many of those bonds, because they were high-yield bonds, they were secured by other obligations of those issuers, and the marketplace, all of these are the disclosures that we've put in the OM and the PPM, defaulted. So therefore, the bonds didn't have the value that they may have had when they were put into the portfolio in September of 1999. FMA, then, if the bond portfolio does not meet these certain liquidity tests, must attempt to sell some of the bonds in the portfolio. Sometimes they can't sell the bonds because the market has just fallen apart. We saw that with the technology sector in March of 2000. If they are able to sell some of the bonds, then it's possible that they can't go back into the marketplace and buy bonds that have a high enough yield in order to substantiate the portfolio. These are all things that were discussed and disclosed in the offering memoranda as being potential risks of this investment. Because the bond market fell apart and because the technology market fell apart, FMA was not able to replace the portfolio with sufficient bonds that were giving a high enough yield to pay off the A, B, C, et cetera, those other tranches. And as set forth in the documents, E, being the unrated and the lowest tranche, was number one in hopes of getting the highest rate of return after everybody else was paid off, was left with no collateral left in order to meet payouts to the other classes of the bonds, and therefore the investment failed. But these were all the types of disclosures that were made, especially for the E class. They were indicated that there was no recourse. If they couldn't pay the other bondholders with the collateral in the portfolio, there was no recourse for anybody else to pay the subsequent noteholders. The liquidity factor was also discussed in great detail. The problems of the specific sectors of the specific industries that were in the portfolio are discussed in those disclosure documents, so that an investor that looked at the offering memoranda would know and appreciate all the various risks that were inherent in the CBO2 portfolio and specifically in the E notes. But the E notes were the ones that everybody was hoping would be the most successful because everyone else would be paid off and what else was left would go to the E notes. So you can appreciate that if the market worked in their favor, they would be the ones that would benefit the most, but they carried the biggest risk as well. And those are the things that we did disclose, which makes the omissions that Mr. Citrick suggests not material because in the totality of the mix of everything that was disclosed in those offering documents, the two items that he wanted in the mix were not relevant as compared to all these other disclosures that we suggested that we make. We think that the Trump case is very important in this instance, and one of the most important things that the Donald Trump case teaches us is that you cannot edit to win. Mr. Citrick cannot go back and try to edit our offering memoranda that we made in September of 1999 in an effort to win his case. It's just not right and it's not fair. Mr. Citrick has not been able to show that these two alleged omissions were indeed material when you look at the totality of the mix of the information. And no discovery, no discovery is going to change that. What was in those documents is what was there in September of 1999. We suggest that any amendment is futile and we suggest that any discovery isn't going to change the fact that what we did put in those documents provides the investor with the information that they need in order to make that investment decision on their own. We also suggest that the statute of limitations all run in September of 1999 at the time that Mr. Citrick knew or should have known the relevant salient features of this investment. He chose to bury his head in the sand. He chose to rely on Mr. Rosen who said it's a mere boilerplate when, in fact, it is not a boilerplate document. All the disclosures are there. He chose not to read them. He did that at his own peril and his own risk. And Prudential met all of its obligations and its duties under the Securities Acts, provided the investors with all of the relevant salient information that they needed in order to make an investment decision. Thank you, Kenton. Thank you. Thank you very much. You have 30 seconds or so. Thank you. On the reliance point, Your Honor is correct. The district court improperly and erroneously rejected the declaration. We now have an alternative explanation. What about that? That being, Your Honor? The legal explanation that counsel gave about why the reliance on the attorney doesn't matter. Well, first of all, there are two problems with that. One, the cases to which counsel referred are cases only in which the person wasn't an agent.
judges: Berzon, Ikuta, Singleton (Alaska)